**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JEFFREY ISRAELITT,** | * | |
| | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Case No. SAG-18-1454** |
| | * | |
| **ENTERPRISE SERVICES LLC,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

<u>**MEMORANDUM OPINION**</u>

Plaintiff Jeffrey Israelitt ("Plaintiff") filed a Second Amended Complaint against his former employer, Enterprise Services LLC ("Defendant"), alleging discrimination on the basis of disability, wrongful discharge, denial of reasonable accommodations, retaliation, and a hostile work environment.[1] ECF 13. Discovery is now concluded. Defendant filed a motion for summary judgment, ECF 48, which I have reviewed along with the relevant exhibits, opposition, and reply. ECF 53, 54. Defendant also filed a motion to reopen discovery, ECF 55, which I have also reviewed along with the relevant exhibits, opposition, and reply. ECF 58, 62. Lastly, Plaintiff filed a motion for leave to file a surreply, ECF 56, which I have reviewed along with the relevant exhibits, opposition, and reply. ECF 57, 59. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will grant Defendant's Motion for Summary Judgment in part and deny it in part, deny Plaintiff's Motion for Leave to File a Surreply, and deny Defendant's Motion to Reopen Discovery.

---

[1] Plaintiff's Second Amended Complaint only includes three Counts, but the legal theories listed appear to be encapsulated within those Counts.

## I.       FACTUAL BACKGROUND

The facts contained herein are taken in the light most favorable to Plaintiff, the non-moving party.   Defendant hired Plaintiff, an Army Veteran, as a senior architect in 2013.   He was interviewed by George Romas, who reviewed his resume and conducted a telephonic interview. ECF 53-1 at 2.   Romas did not inquire about any disability or medical conditions during the interview.   ECF 53-3 at 24-25.   Plaintiff was ultimately hired to be a member of HP's Cybersecurity Solutions Group ("CSG").   When he started on August 5, 2013, Plaintiff's job duties included formulating architectural decisions on information systems for government customers and researching innovative technologies to see how they could be used to "create a discriminator for HP in order to win business."   *Id.* at 24.   Plaintiff's position was "a senior role," *id.*, and he worked remotely.   ECF 48-3 at 96.

Plaintiff has long suffered from a medical condition called hallux rigiditis, marked by degenerative changes in his right first metatarsophalangeal joint and right great toe.   ECF 53-8. He had cheilectomies in 1993 and 1997.   *Id.*   In 2005 and 2018, radiologists examined his foot and found degenerative changes in the metatarsophalangeal joint.   *Id.* at 1-2.   A podiatrist, examining Plaintiff in 2006, stated that he has 'limited range of motion' in his toe.   *Id.* at 3. Plaintiff told the podiatrist at that visit that his pain level is 2/10 and "mild."   *Id.*   Plaintiff has also State of Maryland disability placards as a result of his condition.   *Id.* at 4-9.

Plaintiff reports that, at times, he "can barely walk" because of pain.   ECF 53-2 at 22. Plaintiff walks for physical exercise "a couple of times a week."   *Id.* at 24-25.   As an example, he walks inside a store like Costco for 30-45 minutes, sometimes starting and stopping frequently due to his medical problems.   *Id.*

Near the end of August, 2013, HP began determining which of its employees would attend a conference called HP Protect 2013.   Initially, Plaintiff was slated to attend the conference, though

securing the requisite passes proved less than straightforward.  Kevin Doty, a business consultant on the CSG team, told Todd Helfrich, an account executive who offered to secure passes for CSG's hopeful attendees, that his group had three people they would like to attend the conference, including Plaintiff.  ECF 53-11 at 2.  Helfrich later notified the group that they had eight CSG employees who requested passes and that there would thus be a need "to prioritize attendance." *Id.* at 1.  The campaign marketing manager observed that they were "scrambling to find the funds to pay for George [Romas] and one of his engineers to attend the event."  ECF 53-10 at 1.  Gail Stevens, the capture manager, told the campaign marketing manager, "We would like to have George Romas (CyberSecurity Engineering Lead) and Jeff Israelitt (Lead Architect for our CDM Offering and the Task Orders) attend, and I would like to attend, and I think we might have 1 other person." *Id.*

Eventually, Helfrich sent Plaintiff a code to attend the conference, however the registration code he sent was one otherwise reserved for customers.  ECF 53-13.  Plaintiff promptly registered to attend.  However, he sought to stay at the event hotel in Washington, DC, rather than to commute or stay at a nearby location.  ECF 53-2 at 113.  He asked for a hotel room for persons with disabilities.  *Id.* at 115.   Though there were no hotel rooms available initially, Plaintiff worked with HP Protect event staff and eventually secured a room reservation.  *Id.* at 115-116.  However, on September 10, 2013 he was informed that his conference registration was invalid, because he had used a customer registration code but was an HP employee.  ECF 53-13 at 8.  Plaintiff reported the situation to Doty, and Doty in turn relayed the message to Helfrich.  *Id.* at 7.  Helfrich responded, "Anyone who used the code and registered with their HP email address likely will be turned down. I have some damage control that I need to do. Gail, George and Anil should be good." *Id.* at 6.  In the email exchange that followed, Plaintiff requested clarification of the status of his

registration from Helfrich and, when that was not forthcoming, followed up with Doty about Helfrich's unresponsiveness. *Id.* at 5-6. Doty suggested that Plaintiff coordinate with Romas directly, to which Plaintiff responded referencing several conversations he claimed to have had with Romas regarding the HP Protect conference and his difficulties registering for it. *Id.* at 3. Plaintiff told Doty that Romas had "heard that [Plaintiff's difficulty registering] was as a result of [his] asking the registration team questions," and that Plaintiff told Romas that "the only question I asked involved disability accommodation for lodging." *Id.* Plaintiff then stated that "it appears that this information (medical/disability info that I asked you not to share with anyone) . . . has in itself become the reason I can't go now." *Id.*

Doty forwarded Plaintiff's email to Romas outlining at length his concerns about Plaintiff's behavior, including alleged statements Plaintiff had made to him about faking his disability and manufacturing lawsuits. *Id.* at 2. Romas, in response, said, "after about a 45 minute conversation with [Plaintiff] at around 7pm last night [September 12, 2013], he said he would 'keep his mouth shut' about this, not attend HP Protect, and hoped that the rest of us would not have any trouble attending." *Id.* at 1. Separately during this same time period, Plaintiff and Romas exchanged several emails between September 13 and 15 regarding Plaintiff's registration difficulties, in which Plaintiff suggested that Doty, Helfrich, and others thought that his disability accommodation request had "created a problem" by drawing attention to their registrations. ECF 53-16 at 2. Plaintiff ultimately did not attend HP Protect. Plaintiff suggests that his failure to attend had a detrimental impact on his job by virtue of him missing out on the opportunity to "get familiar with HP's line of products and maybe some services" as well as "networking opportunities." ECF 53-2 at 137.

Roughly two weeks later, on or around September 30, 2013, Romas reassigned Plaintiff from the two-week sprint teams he had originally been staffed on to longer-term assignments, including working on a project called the "Technology Roadmap."  ECF 48-4 at 6.  He was assigned to work on the Technology Roadmap with another senior team member, Jeff Kalibjian.  ECF 53-3 at 15.  Around that same time, Romas told Plaintiff to stop attending the daily "scrum" meetings, because those meetings were part of the two-week sprint "agile" methodology projects on which Plaintiff was no longer working due to his reassignment.  ECF 48-4 at 23.  Plaintiff responded that there was "[n]o problem with that from [his] viewpoint."  *Id.*

Romas gave Plaintiff a performance review in October, 2013.  In the review, Romas stated that Plaintiff had a difficult time with the "agile" methodology as previously noted, but that those "issues have been mostly resolved" due to his role being adjusted.  *Id.* at 24.  The evaluation also noted Plaintiff's confrontational approach, before ultimately giving him average or above average marks in every category.  *Id.*  The notes next to his numerical grades indicated that Plaintiff "has had some issues communicating with the team, but is showing some improvement," and "he's been slow to adapt to the pace of the team, so has not been as productive in achieving his goals." *Id.*  Later that month, Plaintiff received additional feedback from Doty, again indicating that he was not providing the sort of work product expected of him.  *Id.* at 27.  Specifically, Doty questioned how Plaintiff's presentation "related to the analysis for the Task areas 5-15 requirements" and asked that Plaintiff "explain what you have planned for the actual task 5-15 requirements analysis."  *Id.*  On November 22, 2013, Romas recognized Plaintiff in the category of Achievement & Contribution as part of a group commendation praising the team's hard work and diligence.  *Id.* at 25.

In December, 2013, members of the CSG team began planning a strategic development and team-building meeting in St. Augustine, Florida, scheduled for early January.  ECF 53-3 at 9-10.  The team had a small budget for the trip drawn from HP's Department of Homeland Security ("DHS") account, which required attendees to share accommodations and vehicles.  *Id.*  Plaintiff told Romas that he wanted to be listed as an additional driver on one of the vehicles.  ECF 53-2 at 212.  Jess May, the CSG practice lead in charge of managing the CSG development process, including budget and timely progression, informed Plaintiff shortly thereafter that he was not to charge the DHS account anymore and that he would no longer be traveling to Florida.  ECF 53-2 at 212.  Plaintiff was not the only CSG team member who did not attend—Kalibjian did not attend either, for personal reasons.  ECF 53-30 at 1-2.  Plaintiff stated that his absence "created the impression to a lot of people . . . that it looked like I wasn't participating in team events for some reason . . . [which was] open to interpretation by a number of people."  ECF 53-2 at 226.

On January 13, 2014, the first business day after the end of the Florida trip, Romas sent a performance warning to Plaintiff advising that he was failing to meet expectations in the areas of "productivity, initiative and teamwork."  ECF 48-4 at 38.  The warning listed three specific work products that Plaintiff had failed to turn in, including the "Technology Roadmap for DHS CDM Task Areas 5 through 15."  *Id.*  The warning specified, "For the next 30 days, from January 13, 2014 through February 12, 2014, you are required to demonstrate immediate and sustained improvement by successfully completing the Technology Roadmap for Task Areas 5 through 15."  Israelitt refused to sign the warning.  *Id.*  When Plaintiff did not produce the Technology Roadmap for Task Areas 5 through 15 by February 12, 2014, Romas terminated Plaintiff's employment.  *Id.* at 11.

II.     **LEGAL STANDARD**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment,

a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS

Plaintiff's Second Amended Complaint can be read to contain claims of discrimination, wrongful discharge, retaliation, failure to accommodate, and hostile work environment under the Americans with Disabilities Act ("ADA").  Each claim is addressed below.

"When a plaintiff alleges that her employer unlawfully discriminated or retaliated against her in violation of the ADA, she can prove her claim through direct and indirect evidence . . . [or] otherwise . . . may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Laird v. Fairfax Cty., Virginia*, 978 F.3d 887, 892 (4th Cir. 2020).  ADA wrongful discharge claims lacking direct evidence are similarly evaluated via the *McDonnell Douglas* framework, *Messick v. Bd. of Educ. of Wicomico Cty.*, No. CIV.A. GLR-14-2690, 2014 WL 7357554, at *5 (D. Md. Dec. 19, 2014), as are hostile work environment claims, *see Kaszynski v. Thompson*, 83 F. App'x 526, 527-28 (4th Cir. 2003).  Plaintiff has not provided any direct or indirect evidence pertaining to these claims here.  *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (defining direct evidence as evidence that "reflect[s] directly the alleged discriminatory attitude" and "bear[s] directly on the contested employment decision" (quoting *Taylor v. Va. Union Univ.*, 193 F.3 219, 232 (4th Cir.

1999) (en banc))).  Thus, the Court must engage in the *McDonnell Douglas* analysis for each.[2]

The Fourth Circuit has described the mechanics of *McDonnell Douglas* as follows:

> Under the *McDonnell Douglas* proof scheme, the plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the prima facie case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) (holding that prima facie case plus disbelief of employer's asserted justification for employment action is not necessarily sufficient to establish violation; summary judgment appropriate unless plaintiff presents adequate evidence that employer unlawfully discriminated).

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995), as amended

(June 9, 1995), as amended (Mar. 14, 2008).

### A.   Discrimination

"To establish a claim for disability discrimination under the ADA, a plaintiff must prove

'(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question,

and (3) that [her employer] discharged her (or took other adverse employment action) because of

her disability.'"  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015)

---

[2] Precedent is not particularly clear as to whether the *McDonnell Douglas* burden-shifting framework applies to ADA failure to accommodate claims.  *Compare Evans v. Banks Const. Co.*, No. 2:11-CV-2526-CWH, 2013 WL 5437639, at *7 (D.S.C. Sept. 27, 2013), *with Jacobs v. N.C. Admin. Office of the Courts*, No. 7:11-CV-169-BO, 2013 WL 4736171, at *3 (E.D.N.C. Sept. 3, 2013), *aff'd in part, rev'd in part*, 780 F.3d 562 (4th Cir. 2015).  Since Defendant's intent is not at issue in the failure to accommodate context, assessment of Defendant's legitimate explanation for its conduct and whether that explanation is pretextual would appear somewhat misplaced. Regardless, the Fourth Circuit unambiguously requires a plaintiff on summary judgment to provide facts sufficient to support a prima facie failure to accommodate case, just as *McDonnell Douglas* requires.  *See Wilson v. Dollar General Corp.*, 717 F.3d 337, 345 (4th Cir. 2013).  The Court's analysis of Plaintiff's prima facie case here is sufficient to dispose of the issue without reaching next steps of *McDonnell Douglas*, were it to be applicable.

(quoting *EEOC v. Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)).   Plaintiff's discrimination claims fail on the first and third prongs of this analysis.

The ADA defines a "disability" to include "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C.  § 12102(1)(A).  "An individual is disabled under the ADA . . . if he or she: (1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."  *Davis v. University of North Carolina*, 263 F.3d 95, 99 (4th Cir. 2001) (citations omitted).  "Substantially limits" is defined as "significantly restricted as to the condition, manner or duration to the condition, manner, or duration under which the average person in the general population can perform that some major life activity," or the inability "to perform a major life activity that the average person in the general population can perform."  29 C.F.R.  § 1630.2(j)(l)(ii).  "Examples of 'major life activities' are 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'"  *Id.*  Ultimately, "[t]he determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case."  *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) (citations omitted).

Even viewing the facts in the light most favorable to Plaintiff, he has not established a genuine dispute of material fact that he was significantly restricted in his ability to walk (or perform any other major life activity) during his period of employment.  His extremely sparse medical records, many of which are drawn from doctor visits well outside the period of time relevant to this lawsuit, demonstrate a longstanding diagnosis of hallux rigiditis, but contain no indication that

he is significantly impaired in his ability to function.[3]  *See* ECF 53-8 (referencing a limited range of motion but low reported pain level, and generally containing no mention of any lifestyle limitations, significant or otherwise).  While Plaintiff's deposition testimony references occasional severe pain, particularly when cold, that is not enough to constitute *significant* impairment of life activities either, as evidenced by the fact that his physical exercise of choice is walking and he is able to walk for up to 30-45 minutes at times, even taking into account starting and stopping.  ECF 53-2 at 22-25.  The testimony of one coworker, meanwhile, suggests that on a trip to Texas shortly before the HP Protect conference, Plaintiff walked extensively with no apparent issues and never mentioned an impairment.  ECF 48-6 at 17.  Indeed, by his own admission, Plaintiff did not require any disability accommodations during the Texas trip despite staying at a hotel.  ECF 53-2 at 62. Thus, while Plaintiff has certainly provided evidence that he feels severe pain in his foot at times due to his condition, he has failed to establish a question of material fact as to whether that pain substantially limits his major life activities.

The conclusion that Plaintiff has not sufficiently established that he is disabled within the meaning of the ADA is bolstered by a wide body of case law regarding similar toe and foot injuries. "[S]ome limitation in walking [in certain circumstances] . . . do[es] not equate to a substantial limitation in [the] ability to walk."  *Frogge v. Fox*, No. 1:17CV155, 2019 WL 2418749, at *6

---

[3] Defendant argues that Plaintiff should not be allowed to rely upon a number of pieces of evidence he puts forward, perhaps most significantly portions of several medical records that Plaintiff sought to keep Defendant from accessing during discovery.  ECF 54 at 3-4.  This prompted Defendant to file a Motion to Reopen Discovery, ECF 55, seeking to explore those medical records further.  Plaintiff, meanwhile, sought the opportunity to respond to Defendant's arguments regarding Plaintiff's alleged improper reliance on medical records and other evidence.  ECF 56. Re-opening discovery is unnecessary here because, even when considering the evidence to which Defendant objects and without the benefit of the additional medical records it seeks, Plaintiff has failed to establish a disability.  Similarly, consideration of Plaintiff's surreply is unnecessary because the Court has considered the evidence to which Defendant objects.  Both motions will therefore be denied.

(N.D.W. Va. June 10, 2019); *see also Fink v. Richmond*, 405 Fed. App'x 719 (4th Cir. 2010) (finding no genuine dispute of material fact and no disability when a plaintiff was only limited in walking quickly); *Stewart v. Weast*, 228 F. Supp. 2d 660 (D. Md. 2002) (deeming plaintiff to not be disabled because she failed to sufficiently specify the extent to which her walking was disabled); *Harmon v. Sprint United Management Corp.*, 264 F. Supp. 2d 964 (D. Kan. 2003) (plaintiff who could walk half a mile, sit for up to five hours, lift up to 100 pounds, and only had physician restrictions preventing "prolonged" walking, sitting, or standing was not disabled); *Miller v. Wells Dairy, Inc.*, 252 F. Supp. 2d 799 (N.D. Iowa 2003) (plaintiff who could walk well on level surface, but was limited in ability to walk the same distance as previously, walk at the same pace as previously, and walk up three steps was not disabled); *Zuppardo v. Suffolk County Vanderbilt Museum*, 19 F. Supp. 2d 52 (E.D.N.Y. 1998) (plaintiff who could walk more than 1/8th of a mile without stopping was not disabled within the definition of the ADA); *Banks v. Hit or Miss, Inc.*, 996 F. Supp. 802 (N.D. Ill. 1998) (plaintiff who could walk unassisted without use of cane or crutch, has no medical restrictions, and failed to provide any other evidence of substantial limitation in walking was not disabled). Plaintiff, therefore, has not made the requisite showing that he was a qualified individual with a disability in order to survive summary judgment on his ADA discrimination claim.

Even assuming that Plaintiff had been able to establish that he were a qualified individual with a disability, he would then have to show that he was subjected to an adverse employment action, which adversely "affect[ed] employment or alter[ed] the conditions of the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006). The adverse action must result in "some *significant detrimental effect*." *Laird*, 978 F.3d at 893 (internal citations omitted). Plaintiff alleges that the actions taken against him were (1) denial of the opportunity to attend the

HP Protect conference; (2) his removal from the daily scrum call team meetings, (3) denial of the opportunity to attend the planning and team-building trip to Florida; and (4) his ultimate termination.  ECF 53 at 23-25.  Of that list, only the termination affected Plaintiff's employment.  The conference and the trip were one-time, non-mandatory events with no bearing on Plaintiff's ability to perform his work duties.  In his deposition, Plaintiff could only articulate benefits he would have received from attending HP Protect, ECF 53-2 at 137, and raise speculative concerns about how his coworkers interpreted his absence from the Florida trip, *id.* at 226.  While such testimony makes clear that Plaintiff would have liked to attend both events, it does not demonstrate any concrete detrimental impact on his job or workplace environment, let alone a significant one.  *See Johnson v. Balt. City Police Dep't*, No. 12-2519, 2014 WL 1281602, at *17 (D. Md. Mar. 27, 2014) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").  Regarding his removal from team meetings, meanwhile, Plaintiff himself stated in an email at the time the removal occurred that there was "[n]o problem with that from [his] viewpoint," ECF 48-4 at 23, foreclosing any possibility that the removal could be considered adverse.

While the termination is certainly an adverse action, Plaintiff fails to establish that he was terminated *because of* his alleged disability.  To demonstrate discrimination under the ADA, Plaintiff must meet the "but for" standard of causation.  *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235 (4th Cir. 2016).  Put simply, nothing in the record even begins to suggest that Romas, the employee who ultimately made the decision to fire Plaintiff, possessed a discriminatory animus linked to Plaintiff's medical condition.  Plaintiff has not shown that Romas made any disparaging remarks about Plaintiff's disability or, indeed, ever made comments about or otherwise addressed the disability *at all*.  Romas did undoubtedly engage with Plaintiff on multiple occasions regarding Plaintiff's accommodation requests, but while those requests

referenced Plaintiff's assertion of a disability, the emails and deposition testimony regarding those conversations gives no indication that Plaintiff's underlying medical condition itself was ever discussed or at issue.   Put differently, Romas's interactions with Plaintiff centered on his accommodations requests, not the claimed disability underlying them.   Plaintiff's claims are therefore better suited to consideration in the retaliation context.   Given the distinct lack of links between Romas and Plaintiff's alleged disability, "but for" causation cannot be established for the purposes of the summary judgment analysis.   Thus, for all of the foregoing reasons, summary judgment will be granted for Defendant on Plaintiff's ADA discrimination claim.

### B.   Wrongful Discharge

To establish a claim for wrongful discharge under the ADA, Plaintiff must demonstrate that: (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.  *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702-03 (4th Cir. 2001).   An individual is "within the ADA's protected class" if they are "a qualified individual with a disability" under the ADA.  *Id.*

As outlined above in Section III(A), Plaintiff has not established that he was an individual with a disability.   Thus, his wrongful discharge claim fails from the start.   Similarly, for all of the same reasons why Plaintiff has failed to show a "but for" causal link between his disability and his termination in the preceding section, he fails here too to show that his circumstances raised a reasonable inference of unlawful discrimination.   There simply is no evidence linking the individual who terminated Plaintiff, Romas, to some sort of discriminatory animus targeting his underlying disability.   As such, Plaintiff has failed to prove that his discharge occurred under

14

circumstances that raise a reasonable inference of unlawful discrimination.  Summary judgment

on his wrongful discharge claim will be granted for Defendant.

### C.   Retaliation

Plaintiff's next claim alleges that Defendant retaliated against him for requesting

accommodations for his claimed disability on several occasions.  As summarized by the Fourth

Circuit, the ADA retaliation standard is as follows:

> Under 42 U.S.C. § 12203, "[n]o person shall discriminate against any individual
> because such individual has opposed any act or practice *made unlawful by this*
> *chapter* or because such individual made a charge, testified, assisted, or participated
> in any manner in an investigation, proceeding, or hearing under this chapter."
> (emphasis added). In order to establish a prima facie case of retaliation, a plaintiff
> must allege (1) that she has engaged in conduct protected by the ADA; (2) that she
> suffered an adverse action subsequent to engaging in the protected conduct; and (3)
> that there was a causal link between the protected activity and the adverse action.
> *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). In reviewing retaliation claims,
> courts recognize the need to balance the desire to encourage employees to oppose
> unlawful discrimination, with "an employer's interest in maintaining a harmonious,
> productive and loyal workforce." *Fitch v. Solipsys Corp.*, 94 F.Supp.2d 670, 678
> (D. Md. 2000).

*Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002).  Significantly, the

ADA does not require proof of disability to mount a retaliation claim, so the Court's conclusion

that Plaintiff has failed to demonstrate a disability as a matter of law is not relevant.  *Rhoads*, 257

F.3d at 380.  Indeed, Plaintiff does not even have to "prove the conduct he opposed was actually

an ADA violation.  Rather, he must show he had a 'good faith belief' the conduct violated the

ADA."  *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).

A requested accommodation can constitute "conduct protected by the ADA."  *Jacobs v.*

*N.C. Admin. Office of the Courts*, 780 F.3d 562, 577 (4th Cir. 2015).  While there is some question

as to whether Plaintiff's requests for a hotel room at the HP Protect conference and to be a driver

on the trip in Florida were made explicitly as accommodation requests for a disability as opposed

to just general requests, Plaintiff has established a dispute of material fact to this end.  ECF 53-13

(email from Plaintiff to Doty describing his request as one for "disability accommodation"); ECF

53-2 at 17-18 (Plaintiff's testimony that when he requested to be a driver on the Florida trip, he

referenced his disability).  Thus, viewing the facts in the light most favorable to Plaintiff, he has

satisfied the first prong of the retaliation analysis by requesting accommodation.  The second prong

of the analysis is whether Plaintiff suffered an adverse action.  As outlined above in Section III(A),

Plaintiff has failed to demonstrate that denial of the opportunity to attend the HP Protect

conference, denial of the request to be a driver on the trip to Florida, and his agreed-upon removal

from team calls are adverse actions.[4]  That leaves only his termination as an adverse action that

could constitute retaliation.  Thus, to satisfy the final prong of the retaliation analysis, he must

show a genuine issue of material fact as to the causal link between his accommodation requests

and his termination.

To establish a causal connection between the termination and his accommodation requests,

Plaintiff must prove "but-for" causation.  *Gentry*, 816 F.3d at 235-36 ("The only remaining

question is whether the ADA's text calls for a 'but-for' causation standard. We hold that it does.").

Temporal proximity alone is insufficient to prove causation, *id.*, as is merely showing that the

adverse action occurred subsequent to Plaintiff's accommodation requests, *Gibson v. Old Town

Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 182 (4th Cir. 1998).  As an initial matter,

the relevant events are not particularly proximate in time.  The HP Protect conference hotel

---

[4] What qualifies as an adverse action differs slightly in the retaliation and unlawful discrimination
contexts, but only in terms of the scope of actions covered (i.e. whether the acts and harm occurred
in the workplace or not) and not in terms of "the required *effect* or adversity from such actions."
*Laird*, 978 F.3d at 893.  Since the Court's adverse action analysis in this case centers on the
fact that several of Plaintiff's claimed adverse acts did not create significant detrimental effects, the
result is substantively the same in both retaliation and discrimination contexts.

accommodation request and related discussions occurred around September 13, 2013, while the Florida accommodation request occurred around December 19, 2013, roughly three months later. Plaintiff was not terminated until February 14, 2014, an additional two months after his Florida request.  Additionally, his accommodation requests and the alleged retaliatory acts arising out of them involved a range of different HP employees, some of whom are not even alleged to have known about his disability.  *See, e.g.*, ECF 53-2 at 18-19 (discussing whether Jess May, the HP employee who removed Plaintiff from the Florida trip, knew about Plaintiff's disability).  Against this backdrop, Plaintiff may have difficulty meeting his burden to prove causation at trial.

That said, the summary judgment standard is a lower bar than the standard of proof at trial, and Plaintiff's retaliation claim narrowly clears it here—he has established the existence of a question of fact as to whether his accommodation requests were a "but for" cause of his termination.  The relevant causal chain is as follows: Romas received notice of Plaintiff's accommodation request at the HP Protect conference in mid-September 2013, culminating in a number of emails between the two, plus at least one phone call.  Romas also engaged in a side conversation with Doty in which Doty expressed his growing frustration with Plaintiff and questioned the veracity of his disability claims, to which Romas replied "[t]hanks for keeping me informed. . . ."  ECF 53-13 at 1-2.  Just a few weeks later, Romas began giving Plaintiff negative performance evaluations intermixed with some indicators of positive performance.  Then, shortly after receiving Plaintiff's accommodation request to be a driver on the Florida trip and immediately upon conclusion of said trip, Romas issued Plaintiff a performance warning and assigned the strict Technology Roadmap deadline that led to Plaintiff's ultimate termination.  While temporal proximity and sequencing of events are not enough alone to establish a question of fact, the decisive difference here is that this pattern of 1) accommodation request followed by 2) Romas

17

cracking down on Plaintiff's job performance happened twice in relatively quick succession. Plaintiff's requests, followed shortly by Romas taking negative actions against Plaintiff ultimately leading to his termination, narrowly clear the "genuine dispute of material fact" bar.[5]

Since Plaintiff has established the existence of a genuine dispute of material fact as to whether he can make a prima facie case of ADA retaliation, the final *McDonnell Douglas* step is to determine whether Defendant's proffered legal justification for terminating Plaintiff is mere pretext. Defendant claims that it terminated Plaintiff because he failed to complete the area 5-15 Technology Roadmap, which he had been assigned to work on since September, 2013. ECF 48-4 at 11. In response, Plaintiff asserts that this explanation is pretextual because it was unrealistic to expect Plaintiff to complete that assigned portion of the Technology Roadmap in the time allotted him. Its scope, Plaintiff suggests, required a much greater amount of time than the one month he was ultimately given to finish it once the performance warning was handed down. ECF 53 at 24. While Defendant points to a document entitled "Continuous Monitoring – Technology Roadmap task" that outlines precisely what deliverables Plaintiff was expected to complete during the January 13, 2014-February 12, 2014 timeframe, ECF 48-4 at 42-43, that document does not resolve the dispute because the Court has no way of knowing how long it would take for a reasonably diligent employee "to work within Task Areas 5-15 and demonstrate the 'top 3-5 vendors/products

---

[5] This analysis is substantively different than the causation analysis in Section III(A) addressing ADA discrimination. That discrimination analysis centered on the fact that the evidence is entirely devoid of any connection between Romas and Plaintiff's disability—Romas never mentions the disability at all, participated in an email exchange in which another employee expressed skepticism of its existence, and, at best, is only established to have been tangentially aware of it insofar as it is underlying the accommodation requests with which he is dealing. Here, on the other hand, the record firmly establishes that Romas was not only aware of the accommodation requests, but was intimately involved with handling their fallout. He spoke at length with Plaintiff about the HP Protect hotel request, with the result of that conversation being that Plaintiff would "keep his mouth shut" about the issue. ECF 53-13 at 1. Regarding the Florida trip, meanwhile, Plaintiff made the car driver accommodation request directly to Romas. ECF 53-2 at 212.

within each task area' with a 'description of the offering and how it applies to the specific task area,'" ECF 54 at 12-13.  Additionally, it appears the initial deadline for the project was late 2014 and that Plaintiff originally had been assigned a teammate to help with completion of the project, though it is not clear if that deadline and the co-worker assistance provided were meant for the entire Technology Roadmap and, if so, how that overarching Roadmap compared in size to Plaintiff's assigned area 5-15 Technology Roadmap subsection.  ECF 53-33; 53-34 at 6-7.  While the Court has no doubt that such issues can be readily determined at trial, the record as it currently stands does not contain a clear indication of how long that portion of the roadmap would ordinarily take.  There thus exists a question of material fact as to whether Defendant's reason for terminating Plaintiff was pretextual.  As such, Plaintiff's ADA retaliation claim survives summary judgment, specifically with regard to his allegations that he was terminated due to his accommodation requests.

### D.   Failure to Accommodate

Plaintiff's next claim alleges that Defendant denied him reasonable accommodation for his disability.  "A reasonable accommodation is one that (1) 'enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position,' 29 C.F.R. § 1630.2(o)(1)(ii); or (2) 'enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities,' *id.* § 1630.2(o)(1)(iii)."  *Hamel v. Bd. of Educ. of Harford Cty.*, JKB-16-2876, 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018).  To establish a prima facie case for failure to accommodate, a plaintiff must demonstrate  (1) that the employee was an individual with a disability within the meaning of the ADA; (2) that the employer had notice of the disability; (3) that with reasonable accommodation, the employee could perform the essential functions of the position; and (4) that

the employer refused to make such accommodations.  *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11

(4th Cir. 2001); *see also Stephenson v. Pfizer*, 641 F. App'x 214, 219 (4th Cir. 2016) (per curiam);

*Jacobs*, 780 F.3d at 579; *Wilson v. Dollar Gen. Corp.*, 717 F.3d at 345.

Once again, this claim fails because of Plaintiff's failure to demonstrate facts permitting a

reasonable jury to conclude that he is an individual with a disability within the meaning of the

ADA.  In addition to that deficiency, however, Plaintiff's "reasonable accommodation" claim

essentially tries to force a square peg into a round hole.  Plaintiff did not request any reasonable

accommodation to allow him to perform the essential functions of his position.  At best, he

requested reasonable accommodations in the form of (1) an accessible hotel room for the HP

Protect conference, and (2) a listing as a driver for a vehicle to attend the Florida trip.  Even

assuming that his employer denied those accommodations (which is not at all clear from the record

for a variety of reasons), neither of those two unique events constituted essential functions of his

position.[6]  Attendance was not mandatory and, as outlined in Section III(A), Plaintiff did not suffer

any job-related harm as a result of his inability to attend.  Plaintiff's testimony suggests that

attendance at the HP Protect conference would have been helpful, and that he worried his

colleagues would think he was not a team player if he did not attend the Florida trip—but such

concerns about possible upsides and speculative harms cannot be mistaken for descriptions of

essential job functions.

---

[6] Plaintiff eventually obtained the hotel reservation he sought for the conference but was denied admission to the conference because he had sought to use a customer code for entry as an employee.  His use of an improper customer code was unrelated to his assertion of need for an accessible hotel room.  ECF 53-13 at 8.  As to the Florida trip and his driver accommodation request, it is unclear whether the HP employee who ultimately removed him from the trip even knew he was disabled to begin with, let alone knew anything about his accommodation request. ECF 53-2 at 18-19.

Ultimately, Plaintiff has not established that he is disabled within the meaning of the ADA or that he ever requested a reasonable accommodation to allow him to perform the essential functions of his position.   Summary judgment is therefore warranted on his reasonable accommodation claim.

### E.  Hostile Work Environment

In Count Three, Plaintiff alleges that Defendant violated the ADA by subjecting him to a hostile work environment.  The Fourth Circuit has ruled that such a claim can be cognizable under particular circumstances:

> Appropriately modifying the parallel Title VII methodology, an ADA plaintiff must prove the following to establish a hostile work environment claim: (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer. *See Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999) (stating elements of a sexual harassment hostile work environment claim).

*Fox v. General Motors Corp.,* 247 F.3d 169, 177 (4th Cir. 2001).  As discussed above, because Plaintiff has not shown that he is a qualified individual with a disability, his ADA hostile work environment claim fails at its inception.  However, even if he had been able to establish that initial prong, he has not adduced sufficient evidence to meet his burden as to at least two other prongs: that the harassment was based on his disability or that the harassment was sufficiently severe or pervasive to alter a term, condition or privilege of his employment.

Plaintiff does not allege many specific comments relating to his toe in the workplace.  He generally alleges that he was subjected to disrespectful treatment in his exclusion from meetings, and that his inability to attend the Florida trip caused others to view him negatively.  However, simple mistreatment or rude conduct does not suffice to support a hostile work environment claim. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (explaining "complaints

premised on nothing more than 'rude treatment by [coworkers],' 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor'" do not suffice (alterations in original) (citations omitted)); *see also Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (finding a workplace dispute and "some perhaps callous behavior by her superiors" insufficient for a plaintiff to establish severe or pervasive activity, even at the Rule 12(b)(6) stage); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003) (determining that "disrespectful, frustrating, critical, and unpleasant" workplace interactions do not create a hostile work environment).   Other than his unsubstantiated perception that the personality conflict was attributable to his assertion of disability, Plaintiff offers no evidence linking any unpleasant behavior he faced to his medical condition.

Additionally, the few disability-related comments Plaintiff does specifically identify are not sufficiently "severe" or "pervasive" to make a prima facie case of hostile work environment. The email correspondence between supervisors in which at least one individual suggested Plaintiff was faking his disability and was a serial plaintiff, ECF 53-13 at 2, was not even known to him at the time he was employed at HP and thus cannot be deemed to have contributed to his work environment.   To the extent he alleges some comments were made in person, he does not allege the dates or frequency of such comments, or any particular concentration over a limited time frame, sufficient to meet the "high bar in order to satisfy the severe or pervasive test."   *Sunbelt Rentals, Inc.*, 521 F.3d at 315; *see also Dangerfield v. Johns Hopkins Bayview Med. Ctr., Inc.*, Civil No. JKB-19-155, 2019 WL 6130947, at *3 (D. Md. Nov. 19, 2019) (stating, with respect to general allegations of consistent "condescending and abusive language and behavior," "[w]ithout details about the nature of the remarks and behavior at issue, it is impossible for the Court to determine whether the behavior she complains of would be seen as objectively hostile by a 'reasonable

person'"); *Lenoir v. Roll Coater, Inc.*, 841 F. Supp. 1457, 1462 (N.D. Ind. 1992) (finding plaintiff's allegations of being reprimanded more severely than co-workers, without reference to exact dates, to be insufficient to support a harassment claim), *aff'd*, 13 F.3d 1130 (7th Cir. 1994).  Summary judgment for Defendant is thus also appropriate as to the hostile work environment claim.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF 48, will be GRANTED as to Counts I, II, and III, except insofar as Counts I and II include claims of ADA retaliation.  Plaintiff's Motion for Leave to File Surreply, ECF 56, will be DENIED.  Defendant's Motion to Reopen Discovery, ECF 55, will be DENIED.  A separate Order follows.


Dated:  March 2, 2021                                   _____/s/_____
                                                                      Stephanie A. Gallagher
                                                                      United States District Judge

23