IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEFFREY B. ISRAELITT, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. 18-cv-01454-SAG |
| ENTERPRISE SERVICES LLC | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF DECISION**

Plaintiff Jeffrey B. Israelitt ("Plaintiff") claims that his former employer, Enterprise Services LLC ("Defendant" or "Enterprise"), retaliated against him for requesting several accommodations for his claimed disability in violation of the Americans with Disabilities Act ("ADA"). This Court held a bench trial on February 14 and 15, 2022.

This Court has heard and considered all the evidence, both testimonial and documentary. For the following reasons, that evidence does not support Plaintiff's claim of unlawful retaliation. Accordingly, this Court finds in favor of Defendant.

**I.      Findings of Fact**

This Court finds the facts stated herein based on its evaluation of the evidence, including the credibility of the witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

1. Mr. Israelitt was employed by Hewlett Packard ("HP"), a predecessor entity of Enterprise, from August 5, 2013, until his separation on February 14, 2014. ECF 99 ¶ 1 (Stipulation of Facts).

2. George Romas, HP's Chief Engineer and Technical Director of the Cybersecurity practice for the U.S. Public Sector, interviewed and hired Mr. Israelitt for the position of Senior Information Systems Security Architect V. *Id.* ¶ 2

3. Mr. Israelitt held that position throughout his employment and earned an annual salary of $180,000, a monthly salary of $15,000, and a semi-monthly salary of $7,500. *Id.* ¶ 3.

4. Mr. Romas was his assigned manager throughout his employment. *Id.* ¶ 2.

   a. **Mr. Israelitt's Medical Condition**

5. Mr. Israelitt suffers from a medical condition called hallux rigiditis, marked by degenerative changes in his right first metatarsophalangeal joint and right great toe. Pl's Trial Ex. 5 at 3 (Medical Records and Disability Placards).

6. This condition limits Mr. Israelitt's range of motion in his great right toe and, at times, causes him significant pain. *Id.*; Israelitt Testimony, Feb. 14, 2022.

7. Driving—especially in stop-and-go city traffic—can cause Mr. Israelitt significant pain. Israelitt Testimony, Feb. 14, 2022.

8. Mr. Israelitt has State of Maryland disability placards because of his condition. Pl's Trial Ex. 5 at 4-9 (Medical Records and Disability Placards).

   b. **Mr. Israelitt's Interview with HP**

9. During Mr. Romas's telephonic interview of Mr. Israelitt, Mr. Romas did not inquire about any disability or medical conditions. Romas Testimony, Feb. 15, 2022.

10. Mr. Israelitt also told Mr. Romas that he was not familiar with many of HP's products and services. Israelitt Testimony, Feb. 14, 2022.

11. Mr. Romas suggested that Mr. Israelitt could attend the HP Protect conference, where he could gain a better understanding of HP's product offerings. *Id.*

12. HP hired Mr. Israelitt, and he started on August 5, 2022. Pl's Trial Ex. 2 (Offer Letter).

   **c.   Mr. Israelitt's Employment at HP**

13. Throughout his employment at HP, Mr. Israelitt worked remotely from his home, which is located in Glen Burnie, Maryland. ECF 99 ¶ 4 (Stipulation of Facts).

14. Mr. Israelitt was part of the Cybersecurity Solutions Group ("CSG") and worked on CSG's Engineering and Architecture team. Israelitt Testimony, Feb. 14, 2022.

15. Specifically, Mr. Israelitt was an Enterprise Architect working on the Department of Homeland Security's ("DHS") Continuous Diagnostics and Mitigation ("CDM") offering. *Id.*

16. Upon his hiring, Mr. Israelitt was assigned to two main projects.

17. First, Mr. Israelitt was assigned to work on a "Requirements Traceability Matrix" ("RTM") to provide a risk management framework related to DHS's cybersecurity requirements. Romas Testimony, Feb. 15, 2022.

18. Second, Mr. Israelitt was assigned to work on a review of different cybersecurity products that HP customers were using so that the team could be better prepared to bid on the DHS CDM project. *Id.*

19. The second project was referred to as a "Technology Roadmap." *Id.*

   **d.   HP Protect Conference**

20. Near the end of August, 2013, HP began determining which of its employees would attend a conference called HP Protect 2013. Israelitt Testimony, Feb. 14, 2022; Pl's Trial Ex. 10 (Aug. 30, 2013 Email Chain).

3

21. After initial confusion about how many CSG members would be able to attend the conference, Todd Helfrich sent Mr. Israelitt and other team members a registration code to complete their registrations, but the code was one that had been reserved for HP customers, not employees. Pl's Trial Ex. 15 (Sept. 10-13, 2013 Email Chain).

22. Mr. Israelitt registered to attend the conference using the code he received from Mr. Helfrich. Pl's Trial Ex. 13 (HP Protect 2013 Registration).

23. Mr. Israelitt also arranged to stay at the event hotel in Washington, DC, so that he would not have to commute from his house in Glen Burnie, Maryland and risk severe toe pain due to the drive each day. Israelitt Testimony, Feb. 14, 2022; Pl's Trial Ex. 14 (Sept. 6, 2013 Email); Pl's Trial Ex. 16 (Sept. 13, 2013 Email).

24. Mr. Israelitt requested a room for persons with disabilities and coordinated with HP Protect event staff to reserve one. *Id.*

25. Mr. Israelitt used his personal credit card to reserve the room and was intending to pay for it with his own money. Israelitt Testimony, Feb. 14, 2022; Pl's Trial Ex. 15 (Sept. 10-13, 2013 Email Chain).

26. On September 10, 2013, Mr. Israelitt received an email that his conference registration was invalid because he had used a customer registration code but was an HP employee. Pl's Trial Ex. 15 (Sept. 10-13, 2013 Email Chain).

27. Mr. Israelitt sent this email to Kevin Doty, a business consultant on the CSG team, who then forwarded the message to Todd Helfrich an Enterprise Account Executive. *Id.*

28. Mr. Helfrich responded that "[a]nyone who used the code and registered with their HP email address likely will be turned down. I have some damage control that I need to do. Gail, George and Anil should be good." *Id.*

4

29. After Mr. Israelitt requested clarification from Mr. Doty on Mr. Helfrich's response, Mr. Doty suggested that Mr. Israelitt coordinate with Mr. Romas regarding his registration issues. *Id.*

30. Mr. Israelitt responded stating, in part, that "it appears that this information (medical/disability info that I asked you not to share with anyone) which you and I discussed found its way to Todd, and has in itself become the reason I can't go now." *Id.*

31. Mr. Doty forwarded this response to Mr. Romas, who responded "after about a 45 minute conversation with [Mr. Israelitt] at around 7pm last night, he said he would 'keep his mouth shut' about this, not attend HP Protect, and hoped that the rest of us would not have any trouble attending." *Id.*

32. Plaintiff ultimately did not attend HP Protect 2013. Israelitt Testimony, Feb. 14, 2022.

    **e. Mr. Israelitt's Performance and Compatibility Issues**

33. Throughout September 2013, Mr. Israelitt began to have significant performance and interpersonal issues. Romas Testimony, Feb. 15, 2022.

34. Mr. Israelitt immediately struggled to adjust to the "agile method" employed by the CSG team. *Id.*

35. The agile method is a "fail fast" method of making incremental progress on a project and solving problems "as you go" rather than all at once. *Id.*

36. As part of the agile method, teams would conduct daily "scrum" calls designed to last 15-30 minutes to discuss short-term "sprint" projects on which they were working. *Id.*

37. Mr. Israelitt had experience with the agile method from prior employment. Israelitt Testimony, Feb. 14, 2002.

5

38. However, Mr. Romas began to receive complaints from coworkers that Mr. Israelitt was "appropriating" scrum meetings and extending them well beyond the allotted 15-30 minutes, often unnecessarily causing them to last for up to an hour. Romas Testimony, Feb. 15, 2022.

39. Moreover, Mr. Romas testified that Mr. Israelitt had frequent conflicts with his co-workers. *Id.*

40. Those conflicts were documented by contemporaneous emails. For example, on September 6, 2013, just about a month after starting his employment, Mr. Israelitt emailed Mr. Romas complaining that other team members were acting in a way that was "unprofessional, demeaning, humiliating, and dismissive" and asking Mr. Romas to help "put an end to the negative manner in which Gail and Shaundrae treat others[.]" Def's Trial Ex. 14 (Sept. 6, 2013 Email Chain).

41. Mr. Romas testified that Mr. Israelitt frequently raised these kinds of complaints. Romas Testimony, Feb. 15, 2022.

42. On September 25, 2013, Mr. Israelitt again emailed Mr. Romas saying, "Jess is beating up on Michael F. and me about what appears to be a lack of common understanding about DC2 strategy an[d] more on the team call[.]" Def's Trial Ex. 23 (Sept. 25, 2013 Email).

43. On September 29, 2013, Mr. Israelitt emailed Mr. Romas with two pages' worth of complaints about his colleagues and, ultimately, asked Mr. Romas to "assist here to help put an end to the negative manner in which Jess and Kevin treat others." Def's Trial Ex. 25 (Sept. 29, 2013 Email).

44. Mr. Romas testified that he spoke to other team members about Mr. Israelitt's complaints and that they disagreed with Mr. Israelitt's characterizations. Romas Testimony, Feb. 15, 2022.

45. Mr. Romas also testified that he had managed the team for more than two years before Mr. Israelitt was hired and that there were no personnel or compatibility issues before Mr. Israelitt joined the team. *Id.*

46. In late September 2013, Mr. Romas suggested that Mr. Israelitt not attend the daily scrum calls and that he focus exclusively on the RTM project. Def's Trial Ex. 27 (Sept. 30, 2013 Email Chain).

47. Mr. Romas testified that Mr. Israelitt was removed from the scrum calls so that he could focus on a single project and avoid getting bogged down and distracted by the daily calls. Romas Testimony, Feb. 15, 2022; *see* Def's Trial Ex. 27 (Sept. 30, 2013 Email Chain).

48. According to Mr. Israelitt, however, he was removed from the scrum calls because he attempted to attend the HP Protect conference and intended to stay in a handicap accessible room during it. Israelitt Testimony, Feb. 14, 2022.

49. Mr. Romas also asked Jeff Kalibjian, a Distinguished Technologist at HP, to mentor Mr. Israelitt. Romas Testimony, Feb. 15, 2022.

50. According to Mr. Romas, Mr. Israelitt's removal from the daily scrum calls substantially improved the efficiency of the meetings. *Id.*

51. In October 2013, Mr. Israelitt received a performance review from Mr. Romas. Def's Trial Ex. 2 (Performance Review).

52. Although the numerical scores Mr. Israelitt received ranged from average to above average, Mr. Romas's comments clearly indicated that Mr. Israelitt was not interacting with his colleagues in a respectful or professional manner. *Id.*

53. Mr. Romas wrote, "Jeff has had a challenge adjusting to the rapid Agile Integration pace of the team, so there has been some disruption and miscommunication between Jeff and our extended team[;]" "Jeff can be aggressive, like some of the other team members, but I think it is perceived as being confrontational. He will be mentored and counciled [sic] on more diplomatic ways to communicate, and recommended to attend effective communications training." *Id.*

54. Mr. Romas also made clear that Mr. Israelitt's difficulties with his coworkers were impacting his productivity: "he's been slow to adapt to the pace of the team, so has not been as productive in achieving goals." *Id.*

55. Mr. Romas testified that Mr. Israelitt's performance did not meet Mr. Romas's expectations but that he gave Mr. Israelitt decent scores in order to try to motivate him to improve. Romas Testimony, Feb. 15, 2022.

56. Although Mr. Israelitt's RTM project was a long-term project, Mr. Romas asked him to provide weekly progress reports. Def's Trial Ex. 27 (Sept. 30, 2013 Email Chain).

57. In late-October, Mr. Israelitt presented on his progress in a scrum meeting. Romas Testimony, Feb. 15, 2022; Def's Trial Ex. 30 (Oct. 17, 2013 Email Chain).

58. Mr. Romas did not attend, but he testified that he spoke to others in attendance and reviewed Mr. Israelitt's slides. According to Mr. Romas, the presentation revealed that Mr. Israelitt had made little or no substantive progress on the project and was merely restating materials that were publicly available on the Department of Defense website,

rather than providing any substantive analysis or recommendations.  Romas Testimony, Feb. 15, 2022.

59. Mr. Doty also questioned how Mr. Israelitt's presentation "related to the analysis for the Task areas 5-15 requirements" and asked that he "explain what you have planned for the actual task 5-15 requirements analysis."  Def's Trial Ex. 43 (Oct. 22, 2014 Email Chain).

60. Notwithstanding Mr. Israelitt's performance issues, Mr. Romas recognized him on November 22, 2013 for his "Achievement & Contribution" as part of a group commendation praising the team's hard work and diligence.[1]  Pl's Trial Ex. 29 (Nov. 22, 2013 Recognition).

61. On December 3, 2013, Mr. Israelitt sent Mr. Romas a "draft write-up on the Technology Roadmap task."  Def's Trial Ex. 33 (Dec. 3, 2013 Email).

62. According to Mr. Israelitt, however, this document was not a "draft" but a "Project Initiation Document" discussing the project's large scope.  Israelitt Testimony, Feb. 14, 2022.

63. Mr. Romas responded that he was looking for more "meat" and that the document was not sufficient.  Romas Testimony, Feb. 15, 2022.

64. Mr. Romas testified that he spoke with Mr. Israelitt several times and told him that in the roadmap he was looking for a "quick analysis" of products and their positive or negative ratings to provide a general idea of products in the market to use once the task orders came out.  *Id.*

---

[1] On September 6, 2013, Jess May, the CSG practice lead in charge of leading CSG development initiatives, had issued a similar team-focused recognition in the category of "Trust & Respect." Pl's Trial Ex. 12 (Sept. 5, 2013 Recognition).

9

65. Mr. Kalibjian also emailed Mr. Romas on December 20, 2013, attempting to clarify the scope of the project to make sure he and Mr. Israelitt were not "over analyzing or confusing what you want here." Def's Trial Ex. 45 (Dec. 20-21, 2013 Email).

66. Mr. Kalibjian wrote, "I think what you want is: 'an examination of current products in 5-15 with quick analysis on capabilities/requirements and future features (i.e. where market is going) with strategy on how/when we introduce into the HP CDM Solution Offering[.]'" *Id.*

67. Mr. Romas responded, "Yes, that's a good clarification![,]" and Mr. Kalibjian forwarded the email chain to Mr. Israelitt the following day. *Id.*

   **f.  Florida Team-Building Meeting**

68. Around the same time, the CSG team was planning a strategic development and team-building meeting in St. Augustine, Florida, scheduled for early January 2014. Israelitt Testimony, Feb. 14, 2022.

69. Mr. Israelitt grew concerned about the amount of walking required on the trip after Ms. May provided maps of the city and the locations at which events and activities were to take place. *Id.*

70. He raised these concerns with Mr. Romas in mid-December. *Id.*

71. As a solution, Mr. Israelitt told Mr. Romas that he wanted to be listed as an additional driver on one of the rental vehicles. *Id.*

72. Mr. Romas told Mr. Israelitt he would inquire about this request but did not affirmatively suggest any alternative solutions. *Id.*

73. On December 19, 2013, Ms. May told Mr. Israelitt to stop billing his time to the DHS account code. Def's. Trial Ex. 35 (Dec. 19, 2013 Email).

74. Mr. Romas testified that this decision was Ms. May's, not his.  Romas Testimony, Feb. 15, 2022.

75. Accordingly, Mr. Romas told Mr. Israelitt that he would no longer attend the trip. Israelitt Testimony, Feb. 14, 2022.

76. Mr. Israelitt interpreted his exclusion from the trip as retaliation for his request to be listed as an alternative driver.  *Id.*

   **g.  Performance Warning and Termination**

77. On January 5, 2014, Mr. Romas filled out a Performance Coaching Template.  Def's Trial Ex. 36 (Performance Coaching Template).

78. In it, Mr. Romas discussed Mr. Israelitt's inability to adapt to the "2-week integration sprint[]" format, and his issues related to the HP Protect conference.  *Id.*

79. With respect to the HP Protect conference, Mr. Romas wrote: "[Mr. Israelitt], and others on the team, had trouble registering for this event.  He spent a lot of wasted time with several team members, including myself, complaining about the process.  He also attempted to get a hotel room with an unsubstantiated handicapped status (concerning an injured toe), which led to additional wasted time spent arguing with hotel and HP Protect planning personnel.  At this time (2 days before the conference started) directed [sic] him not to attend because it was unsure whether he was registered or if he would be reimbursed for a hotel room . . . . Jeff has not been able to get over this issue, and still brings it up periodically."  *Id.*

80. He also explained that, "In an attempt to make Jeff a collaborative and productive member of the team, I assigned him several tasks to either work on his own or work with other teammates . . . In every case, he provided little to no value, either not

11

producing deliverables (which had to then be assigned to other team members), or producing irrelevant deliverables[.]" *Id.*

81. With respect to the Technology Roadmap specifically, Mr. Romas explained: "After several explanations reiterating what I expected from this roadmap task, Jeff still did not understand what to do. On [December 15, 2013], I provided him explicit instructions in an email, but a month later he still has not produced any deliverables. He claims that he is continually researching the issue, but I have seen no evidence of his work. For the past 3 months, I have also had weekly meetings with Jeff and my two other senior architects/engineers with the hope that my management and their mentoring would help Jeff become a productive team member, to no avail." *Id.*

82. On January 13, 2014, the first business day after the end of the Florida trip, Mr. Romas sent a performance warning to Mr. Israelitt. Pl's Trial Ex. 35 (Performance Warning).

83. The performance warning stated that Mr. Israelitt was "failing to meet what is expected" of his position in the areas of "productivity, initiative and teamwork." *Id.*

84. More specifically, it noted Mr. Israelitt's "[r]efusal to accept tasking from the Scrum Master[;] [f]ail[ure] to produce a requirements Traceability Matrix (RTM) for the DHS CDM program[;] [f]ail[ure] to provide the research and analysis of Network Access Control (NAC) products[;] and [failure to] produce a Technology Roadmap for DHS CDM Task Areas 5 through 15[.]" *Id.*

85. The performance warning also stated that: "For the next 30 days, from January 13, 2014 through February 12, 2014, you are required to demonstrate immediate and sustained improvement by successfully completing the Technology Roadmap for Task Areas 5 through 15." *Id.*

86. Mr. Romas spoke with Mr. Israelitt about the warning, and, according to Mr. Romas, Mr. Israelitt disagreed with it, was very upset about it, and refused to sign it. Romas Testimony, Feb. 15, 2022; Def's Trial Ex. 39 (Jan. 16, 2014 Email Chain).

87. Mr. Israelitt also asked for help completing the Technology Roadmap, but Mr. Romas told him that he needed to work on the project himself and that he could use Mr. Kalibjian for peer review. Romas Testimony, Feb. 15, 2022; Def's Trial Ex. 39 (Jan. 16, 2014 Email Chain).

88. Mr. Israelitt viewed this as an impossible task, designed to set him up for failure. Israelitt Testimony, Feb. 14, 2022.

89. In Mr. Israelitt's view, Mr. Romas was asking for a comprehensive review of hundreds of products (which meant the deliverable Mr. Romas was asking for was, in fact, a "Products Roadmap" not a "Technology Roadmap") which would have taken a group of people several months and was simply impossible for one person to complete in a single month. Israelitt Testimony, Feb. 14, 2022.

90. Mr. Romas assured Mr. Israelitt, however, that he was only looking for an outline of "the top 3-5 vendors/products within each task area." Def's Trial Ex. 37 (Technology Roadmap Task).

91. Mr. Romas even prepared a document for Mr. Israelitt specifically describing the deliverable he was looking for. *Id.*

92. That document stated: "Each vendor/product should have a description of the offering and how it applies to the specific task area. Independent evaluations . . . should be included, in general describing pros and cons and comparisons of products within the same task area." *Id.*

93. The document also stated: "I previously had sent you a PowerPoint deck that shows which HP products fit into the components in the graphic above. I am also sending you an Excel file, also previously sent to you, that shows various ways to map and compare these task areas to products and applicable security standards (standards mapping not needed for this particular task). If time permits, I'd like to see a proposed schedule for doing a more detailed evaluation of products, based on technical merits as well as querying the accounts for existing licenses. By COB Wednesday, 1/15/1[4], I'd like to see your 30-day schedule and what we'll be reviewing at each weekly milestone meeting." *Id.*

94. Over the month that followed, Mr. Romas took contemporaneous notes on Mr. Israelitt's progress. Def's Trial Ex. 1 (Notes on Jeffrey B. Israelitt PW Performance).

95. The notes reveal that, in Mr. Romas's view, Mr. Israelitt was not making progress on the roadmap assignment, that he was asking other team members for help on it, and that he was not taking seriously his obligation to make progress on the assignment. *Id.*; Romas Testimony, Feb. 15, 2022.

96. On February 14, 2014, Mr. Romas made the decision to terminate Mr. Israelitt due to his lack of progress on the roadmap assignment. Def's Trial Ex. 40 (Termination Letter).

97. Mr. Romas testified that if Mr. Israelitt had made any progress, he would not have been terminated and that Mr. Israelitt's accommodation requests had nothing to do with his termination. Romas Testimony, Feb. 15, 2022.

II. **Conclusions of Law**

As summarized by the Fourth Circuit, the ADA retaliation standard is as follows:

> Under 42 U.S.C. § 12203, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice *made unlawful by this chapter* or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." (emphasis added). In order to establish a prima facie case of retaliation, a plaintiff must allege (1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action. *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). In reviewing retaliation claims, courts recognize the need to balance the desire to encourage employees to oppose unlawful discrimination, with "an employer's interest in maintaining a harmonious, productive and loyal workforce." *Fitch v. Solipsys Corp.*, 94 F. Supp. 2d 670, 678 (D. Md. 2000).

*Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002). Significantly, the ADA does not require proof of a disability to mount a retaliation claim, so this Court's prior conclusion that Plaintiff failed to demonstrate a disability as a matter of law does not preclude his ability to prevail on his retaliation claim. ECF 63 at 10-12; *Rhoads*, 257 F.3d at 380. Put differently, Plaintiff does not have to "prove the conduct he opposed was actually an ADA violation. Rather, he must show he had a 'good faith belief' the conduct violated the ADA." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). A requested disability accommodation can constitute "conduct protected by the ADA." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 577 (4th Cir. 2015). Moreover, to establish a causal connection between the termination and his accommodation requests, Plaintiff must prove "but-for" causation. *Gentry v. East West Partners Club Mgmt. Co., Inc.*, 816 F.3d 228, 235-36 (4th Cir. 2016) ("The only remaining question is whether the ADA's text calls for a 'but-for' causation standard. We hold that it does."). Temporal proximity alone is insufficient to prove causation, *id.*, as is merely showing that the adverse action occurred after Plaintiff's accommodation requests. *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 182 (4th Cir. 1998).

Accordingly, to prevail, Mr. Israelitt must show that (1) he engaged in conduct protected by the ADA by asking to stay in a handicap accessible room at the HP Protect conference and/or by asking to be listed as an alternate driver during the Florida trip, (2) he suffered an adverse action subsequent to those requests,[2] and (3) that his requests for accommodation were the "but-for" cause of his termination. Mr. Israelitt has not come close to meeting his burden.

There is no dispute that Mr. Israelitt's termination constitutes an adverse action. This Court is left, then, to evaluate whether Mr. Israelitt has shown that he engaged in protected conduct and, if he did, whether that protected conduct was the "but-for" cause of his termination. Assuming Mr. Israelitt engaged in protected conduct,[3] that conduct was not the "but-for" cause of his termination.

The evidence elicited at trial—both documentary and testimonial—unequivocally demonstrates that Mr. Israelitt was terminated because he was an incompatible teammate who failed to take directions from his superiors, and, most significantly, failed to make any meaningful progress on the tasks that were assigned to him. Shortly after beginning work at HP, Mr. Israelitt began derailing team meetings and frequently emailing Mr. Romas and others with vociferous complaints about his colleagues. Romas Testimony, Feb. 15, 2022; Def's Trial Exs. 14, 23, 25.

---

[2] This Court previously held that his exclusion from the HP Protect conference, the Florida trip, and the daily scrum calls did not constitute adverse employment actions. ECF 63 at 13. The facts elicited at trial support these conclusions but, even if they could be considered adverse actions, the facts unquestionably demonstrate that his requests for accommodation had nothing to do with any of these actions.

[3] Defendant argues that Mr. Israelitt did not engage in protected conduct because neither of his requests for accommodation was supported by a "'reasonable, good faith belief' that he needed an accommodation to perform the essential functions of his job on account of his alleged disability," given the one-off, non-mandatory nature of the HP Protect conference and the Florida trip. ECF 102-1 at 3 (quoting *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 n.2 (3d Cir. 2004)). Defendant's arguments are well-taken, but this Court need not resolve this question since the lack of causation is so clear.

Within less than two months of starting at HP, Mr. Israelitt had to be separated from the rest of the team and forced to work on discrete tasks essentially by himself because he was unable to get along with his co-workers and unable to participate productively on the daily scrum calls. Romas Testimony, Feb. 15, 2022; Def's Trial Ex. 27. And when he was given those discrete tasks, the unrefuted evidence demonstrates that he failed to make any meaningful progress on them—even when he was given one final chance. Romas Testimony, Feb. 15, 2022; Def's Trial Ex. 36; Pl's Trial Ex. 35. Mr. Israelitt may have believed that the Technology Roadmap task was impossible to complete by himself in a month—indeed, it is abundantly clear that Mr. Israelitt's understanding of what a "technology roadmap" *should be* is different from what Mr. Romas was seeking. Israelitt Testimony, Feb. 14, 2022; Romas Testimony, Feb. 15, 2022. But the productive response to that concern would have been to seek clarity on the project's scope and to work as hard as he could to make whatever progress was possible in the time allotted on the product his supervisor wanted. Instead, he made no discernable progress, even after Mr. Romas's affirmative efforts to explain the deliverable he envisioned and to encourage Mr. Israelitt to make some progress toward that goal. Romas Testimony, Feb. 15, 2022; Def's Trial Exs. 1, 36; Pl's Trial Ex. 35.

Regardless, even if the project were as impossible as Mr. Israelitt contends, he has presented no evidence that could connect his requests to stay in an accessible hotel room or to be an alternate driver on a rental car application to his termination. Mr. Israelitt did not present any evidence that anyone at HP cared one way or the other about either of these requests, let alone that they fired him because of them. Instead, Mr. Israelitt relies on his own testimony that his relationships with his colleagues were like "night and day" before and after the HP Protect conference, culminating in his removal from the scrum meetings shortly after the conference. Israelitt Testimony, Feb. 14, 2022. Mr. Israelitt was also told not to bill to the DHS account code

17

shortly after he requested to be listed as an alternate driver during the Florida trip, and he was given a performance warning on the first business day after his colleagues came back from the trip. Def's Trial Ex. 35; Pl's Trial Ex. 35. But Mr. Israelitt has not presented any evidence that any of these decisions were in any way related to his benign requests for accommodations that HP never opposed. To conclude otherwise would be to ignore the mountain of evidence that Mr. Israelitt was fired simply because he was an incompatible and unproductive employee.

Mr. Israelitt argues that Mr. Romas assigned him the Technology Roadmap assignment knowing it would be impossible for him to complete and, thus, set him up for failure so that he could be terminated.[4] This argument is both incredible and unsupported. First, the evidence suggests Mr. Romas gave Mr. Israelitt every opportunity to succeed rather than to fail by: removing him from uncomfortable interactions with colleagues; assigning him his own projects so that he could add value; assigning him a senior mentor; going out of his way to describe the deliverables he was looking for; and staying in frequent communication with Mr. Israelitt to try to monitor his progress and encourage him to focus on his assignments. Romas Testimony, Feb. 15, 2022; Def's Trial Exs. 1, 27, 37, 39. Second, it defies common sense to think that Mr. Romas would engage in a months-long endeavor designed to terminate Mr. Israelitt because he booked a handicap accessible hotel room and asked to be listed as an alternative driver on a rental car application. Again, Mr. Romas credibly testified that he did not have any objection to either of these accommodation requests, and Mr. Israelitt has given this Court no reason to question that testimony.

---

[4] It is worth noting that an employer is within its rights to assign an at-will employee a difficult or even impossible task and to fire the employee for failure to complete that task, so long as the employer is not motivated by a discriminatory or retaliatory purpose prohibited by law. However, the problem in this case appears to be a basic misunderstanding between Mr. Israelitt and Mr. Romas about the scope of the technology roadmap task.

Instead, Mr. Israelitt relies almost exclusively on the alleged temporal proximity between his requests and subsequent events that he viewed as retaliatory. But it is well established that temporal proximity alone is not sufficient to establish the causation element of a retaliation claim. *Gibson*, 160 F.3d at 182 ("'*Post hoc ergo propter hoc* is not enough to support a finding of retaliation' . . . [Plaintiff] needed, and failed, to offer evidence that his [protected conduct] in some way triggered [the adverse action].") (quoting *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998)).

Accordingly, this Court finds that Mr. Israelitt was terminated because of his compatibility and performance related issues. In other words, Mr. Israelitt's requests for accommodation were not the "but for" cause of—indeed, this Court finds they were unrelated to—his termination. Mr. Israelitt has, therefore, failed to prove his retaliation claim.

### III.   Conclusion

For the foregoing reasons, this Court finds that Plaintiff has failed to meet his burden to prove that Enterprise retaliated against him. Therefore, judgment will be entered in favor of Enterprise and against Mr. Israelitt. A separate order follows.

Dated: March 7, 2022                                                                 /s/
                                                                                                 Stephanie A. Gallagher
                                                                                                 United States District Judge